# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| JOY C. COLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 09 C 2895 |
| v. | ) | |
| | ) | Magistrate Judge |
| MICHAEL J. ASTRUE, | ) | Martin Ashman |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Joy Cole ("Plaintiff") seeks judicial review of a final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income benefits ("SSI") under Title II of the Social Security Act. Before the Court are motions for summary judgment filed by Plaintiff and the Commissioner. The parties have consented to have this Court conduct any and all proceedings in this case, including entry of final judgment. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). Unfortunately, the long and troubling history of errors that have fueled this case for ten years has not come to an end despite clear instructions from the Appeals Council on the issues that were to have been addressed in this proceeding. For the reasons discussed below, both motions are granted in part and denied in part.

# I.  <u>Legal Standard</u>

In order to qualify for DIB, a claimant must demonstrate that he is disabled.  An individual is considered to be disabled when he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy.  *Id.*  Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A claim of disability is determined under a five-step analysis. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  First, the SSA considers whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(4)(I).  Second, the SSA examines if the physical or mental impairment is severe, medically determinable, and meets the durational requirement. 20 C.F.R. § 404.1520(4)(ii).  Third, the SSA compares the impairment to a list of impairments that are considered conclusively disabling.  20 C.F.R. § 404.1520(4)(iii).  If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation proceeds to step four. *Id.*  Fourth, the SSA assesses the applicant's RFC and ability to engage in past relevant work. 20 C.F.R. § 404.1520(4)(iv).  In the final step, the SSA assesses whether the claimant can engage in other work in light of his RFC, age, education and work experience.  20 C.F.R. § 404.1520(4)(v).

Judicial review of the ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."   Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The court reviews the entire record, but does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  Thus, even if reasonable minds could differ whether the Plaintiff is disabled, courts will affirm a decision if the ALJ's decision has adequate support.  *Elder*, 529 F.3d at 413 (citing *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

## II.   Procedural History

Plaintiff filed for DIB and SSI on September 18, 2001, claiming that she had become disabled as of June 1, 1999.  The Social Security Administration ("SSA") denied her claim initially and on reconsideration, and Plaintiff appeared for a hearing on December 18, 2002 before an Administrative Law Judge ("ALJ").  On February 6, 2003, the ALJ issued a decision finding that Plaintiff was not disabled.  The ALJ found, for example, that Plaintiff's condition of Meniere's Disease[1] was "severe" but that it did not meet or medically equal a listed impairment despite the fact that the testifying medical expert, Dr. Walter Miller, stated that it did.  (R. 42.)

---

[1]  Meniere's Disease "is an inner ear disorder that produces vertigo, fluctuating senso-rineural hearing loss, and tinnitus."  The Merck Manual 794 (18th ed. 2006).

An action contesting the ALJ's decision was eventually filed in federal court, which remanded the case to the SSA on a joint stipulation by the parties.

The Appeals Council then issued a remand order on July 8, 2004 that specifically instructed the ALJ to resolve two issues. First, the Appeals Council noted that the medical expert failed to state what listing requirement was met by the Plaintiff's medical condition and that the ALJ failed to evaluate the medical expert's opinion. Accordingly, it instructed the ALJ to obtain supplemental medical evidence to remedy this failing. Second, the ALJ was directed re-evaluate the Plaintiff's credibility in accord with the SSA's regulations. (R. 236-37.)

A second administrative hearing was held on October 6, 2004, and the ALJ once again issued an unfavorable decision on November 23, 2004. (R. 220-23.) The Appeals Council, in turn, again remanded the case to the ALJ for failing to comply with the instructions contained in the Council's prior remand order. The ALJ was once again instructed to resolve inconsistencies between the opinion of the first medical expert, Dr. Miller – who stated that Plaintiff met a listing requirement – and expert testimony at the second hearing that she did not. The ALJ was also told once more to evaluate the Plaintiff's credibility in a proper manner and to address whether Plaintiff had an underlying medically determinable physical or mental impairment that could reasonably be expected to produce her alleged symptoms. (R. 229-30.)

On remand, the case was assigned to a new ALJ who held a hearing on December 10, 2007 and issued another unfavorable decision on September 19, 2008. The Appeals Council denied review, and the ALJ's decision became the Commissioner's final decision. Plaintiff then filed the instant action on May 12, 2009.

### III.    Background Facts

Plaintiff, a 49 year old woman, claims that she became disabled as of June 1, 1999, when problems with dizziness required her to stop working as an accounting office manager.  Plaintiff had earlier been diagnosed in 1995 by her treating physician, Dr. Michael Farhi, with benign essential tumor, an involuntary tremor of the arm.  (R. 154.)  In 1998, Dr. Farhi also diagnosed Plaintiff with a spastic colon.  (R. 152.)  More serious symptoms of dizziness and other equilibrium problems presented in June, 1999 after Plaintiff suffered from an infection of her left ear.  (R. 151-52, 319, 326.)  Dr. Farhi followed up his diagnosis by ordering an MRI of Plaintiff's ears, which showed inflammatory changes to her left mastoid air cells.  (R. 126.)

Many related diagnoses followed this initial presentation of symptoms, including labyrinthitis, an inflammation of the inner ear, nystagmus – an involuntary eye movement related to vestibular damage – tinnitus, and allergies.  (R. 151.)  To help diminish the severity of her dizziness, Dr. Farhi prescribed Valium as well as various allergy medications.  Although her symptoms waxed and waned, they persisted over time, and in January, 2002, Dr. Farhi diagnosed Plaintiff as suffering from Meniere's Disease.  (R. 143-44, 169.)  After Plaintiff experienced some "floor-moving episodes," Dr. Farhi also added vertigo to the list of disorders she was experiencing in 2002.  (R. 165-67.)  As before, he noted that her symptoms were not always uniform and that they waxed and waned over time.  (R. 165-69.)

### A.    First Administrative Hearing

Plaintiff appeared without counsel at the first administrative hearing held on December 18, 2002.  Plaintiff testified that she experienced some form of equilibrium

disturbance every day, although the intensity of her symptoms varied from time to time. She was able to drive short distances, read for thirty minutes, and work on her computer and stand for twenty minutes each. She stated that she paces herself throughout the day. After performing a few chores around the house and doing eye exercises to control her nystagmus, Plaintiff rests before picking up her son from school in the afternoon. She prepares meals step-by-step throughout the day so that no single task triggers symptoms. Disturbing episodes begin with a feeling of pressure and weight pressing down on her head, and at their worst, Plaintiff can experience nausea and feelings "like I'm in an earthquake." (R. 34.) Plaintiff also testified that the dizziness she experiences had become so disturbing that she sought emergency treatment on two occasions. Although no audiology records were submitted to the ALJ, Plaintiff stated that she had a hearing test that showed normal results.

Medical expert Dr. Walter Miller testified that his review of the evidence showed that Plaintiff suffered from Meniere's Disease. Although Meniere's Disease is ordinarily associated with hearing loss, Dr. Miller stated that such symptoms wax and wane. Based on his examination of the medical evidence and questions he asked Plaintiff at the hearing, Dr. Miller testified that she met a listing category. (R. 42.) Notwithstanding this statement, the ALJ determined that Plaintiff was not disabled.


### B.       The Second Administrative Hearing

Plaintiff continued to see Dr. Farhi after the first administrative hearing, and he also submitted a Meniere's Disease residual functional capacity ("RFC") assessment on October 4, 2004. Dr. Farhi noted that he had treated Plaintiff for eight years and that she had a history of

balance problems, tinnitus, and progressive hearing loss that was established by examination in his office. Attacks occurred for Plaintiff one to two times a month and could last up to five days at a time. Dr. Farhi stated that Plaintiff was unable to ambulate without assistance during these episodes and that moving around exacerbated her symptoms. Based on his evaluation of Plaintiff's condition, Dr. Farhi concluded that Plaintiff was unable to perform work duties while having an attack. Plaintiff's treating physician also stated that he did not believe that emotional factors played any part in her symptomology. (R. 297-301.)

Dr. Farhi's report was submitted to the ALJ for the second administrative hearing that took place on October 6, 2004. Medical expert Dr. Carl Leigh testified that Plaintiff suffered from chronic labyrinthitis, benign essential tumor, irritable bowel syndrome, and allergic rhinitis. Dr. Leigh applied listing 2.07, which requires both a disturbed function of the vestibular labyrinth and hearing loss determined by audiology. Noting that no record of any audiology test had been presented, Dr. Leigh found that Plaintiff did not meet or medically equal that listing. As in the first decision, the ALJ again found that Plaintiff was not disabled.

### C.    The Third Administrative Hearing

Prior to the third administrative hearing, Dr. Farhi completed a second Meniere's Disease RFC. Unlike the one submitted at the second hearing, the new RFC assessment stated that Meniere's Disease had now been established by audiometry. (R. 304.) Dr. Farhi concluded that Plaintiff would need to take four to five unscheduled breaks during an eight-hour work day and that she would be absent from work three times a month. (R. 307.) Plaintiff was also examined prior to the hearing by consulting physician Dr. Zainulabuddin Syed, an internal medicine

specialist.  Dr. Syed determined that Plaintiff had suffered from Meniere's Disease since 1999 and that it prevented her from working.  (R. 311.)

Two medical experts testified at the third hearing held on December 10, 2007. Dr. Roland Manfredi, a neurologist, testified that Plaintiff likely suffered from Meniere's Disease at first, but that if she had continued to suffer from it, one would expect to see changes in the inner ear as well as hearing loss.  However, Dr. Manfredi admitted that she could have a chronic, recurring case of the disorder.  When pressed by the ALJ as to a possible psychological cause for Plaintiff's condition, Dr. Manfredi stated that little medical evidence supported such a conjecture. (R. 365.)  Dr. Manfredi, however, did hypothesize that Plaintiff's symptoms could have been caused by low blood pressure.  Both medical experts at the third hearing testified on this issue only in the hypothetical and did not rely on any part of the record to support a finding that Plaintiff, in fact, was hypotensive.

Dr. James McKenna, an internal medicine specialist, also testified at the hearing. Dr. McKenna laid considerable emphasis on Plaintiff's statement that her condition improved if she sat down and noted that doing so would ordinarily not benefit a person suffering from a vestibular problem.  Like Dr. Manfredi, Dr. McKenna also believed that low blood pressure could account for Plaintiff's symptoms.  Unlike Dr. Manfredi, however, Dr. McKenna testified that Plaintiff's condition could be psychosomatic in nature, especially considering her lack of positive reaction to medical management and her "non-specific" symptoms such as a feeling of pressure in her head.  Admitting that he was not an expert in the field, Dr. McKenna stated that he was "shocked" by Dr. Farhi's statement that Plaintiff experienced two to three attacks a month and that her symptoms lasted several days after each attack.  (R. 393-94.)  Dr. McKenna

concluded that Plaintiff did not meet a listed impairment, but based on Dr. Farhi's evaluation, Dr. McKenna stated that Plaintiff would not be able to regularly work an eight-hour day while she was experiencing such symptoms. (R. 394.)

Also present at the third hearing was vocational expert ("VE") Thomas Gusloff. Based on Dr. McKenna's statements on the number of days Plaintiff would need to be absent from work, Gusloff testified that Plaintiff was not capable of performing her past relevant work or any other competitive employment in the national economy. (R. 405-06.) This testimony contrasted with statements at the first administrative hearing, where VE Cheryl Hoiseth stated that Plaintiff would be able to work in the national economy. (R. 47-49.)

### D.     The ALJ's Decision

The ALJ determined at step one that Plaintiff had not engaged in any substantial gainful activity since her alleged onset date. At step two, the ALJ stated that Plaintiff suffered from "at least one" medically determinable, severe impairment, although he did not identify what that impairment was. Plaintiff was not found to have an impairment or combination of impairments that met or medically equaled a listing requirement at step three. Finding that Plaintiff's testimony was not entirely credible, the ALJ determined that she had the RFC to perform sedentary work and ruled out any activities that required climbing ladders or working at unprotected heights, more than occasional stooping, working around hazards, operating vehicles, or tasks that involved understanding, remembering, or carrying out complex tasks on a sustained basis. Plaintiff had no past relevant work at step four. At step five the ALJ found that

significant numbers of jobs existed in the national economy that Plaintiff could perform. As a result, the ALJ concluded that Plaintiff was not disabled. (R. 180-91.)

## IV. <u>Discussion</u>

Plaintiff argues that the ALJ erred on multiple grounds. Regarding the five evaluative steps, Plaintiff contends that the decision was incorrect: (1) at step two when the ALJ failed to identify which of her impairments were severe; (2) at step three by failing to resolve inconsistencies in the testimony of various medical experts, as directed by the Appeals Council; and (3) at step five by failing to resolve inconsistencies in the testimonies of the vocational experts. Alongside these errors, Plaintiff also argues that the ALJ failed to correctly assess her credibility and her RFC, erroneously made independent medical findings, and failed to assess the weight given to the testifying experts or her treating physician.

### A. The Step Two Issue

The ALJ determined that Plaintiff "had at least one, medically determinable, 'severe' impairment, or its equivalent," (R. 183), but he did not identify which of her various complaints was found to meet this standard. A careful analysis of the ALJ's reasoning at step two, which was unusually lengthy, also fails to suggest which of Plaintiff's medical conditions the ALJ found to be severe. The Commissioner contends that this oversight is legally irrelevant because step two is essentially a gatekeeping function. If a severe impairment is found, the analysis proceeds to step three to consider if an impairment or combination of impairments – including those not found to be severe at step two – meets a listed impairment; if no condition qualifies as

severe at step two, a claimant is found to be not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii) ("If you do not have a severe . . . impairment . . . we will find that you are not disabled.").

The Court agrees with this analysis. A finding at step two that a medical condition is severe "is merely a threshold requirement." *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999). By finding one impairment to be severe, the ALJ is later obligated to consider the total effect of all of a claimant's impairments, both severe and non-severe. *See Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) ("Having found that one or more of [claimant's] impairments was 'severe,' the ALJ needed to consider the aggregate effect of this entire constellation of ailments – including those impairments that in isolation are not severe.") (emphasis omitted); *see also Raines v. Astrue*, No. 06-cv-0472, 2007 WL 1455890, at *7 (S.D. Ind. April 23, 2007) ("As long as the ALJ proceeds beyond step two, as in this case, no error could result solely from his failure to label an impairment as 'severe.'").

*Raines* and the Commissioner's own authority, *Maziarz v. Sec. of Health & Human Servs.*, 837 F.2d, 240 (6th Cir. 1987), both involve an ALJ's failure to classify a given impairment as severe, not an oversight in actually identifying a severe impairment at step two altogether. Nevertheless, the Court believes that analogous reasoning applies to this case. By determining that Plaintiff suffered from at least one severe condition, the ALJ obligated himself to proceed to step three and, if no listing requirement was met, beyond that point to consider the full range of Plaintiff's medical complaints as well as all the medical evidence as part of his subsequent analysis. Although Plaintiff raises various arguments relating to the ALJ's treatment of the medical experts and his consideration of the evidence concerning her condition, these arguments are more properly asserted in relation to the other errors alleged in Plaintiff's motion.

Plaintiff has not shown how the ALJ's failure to identify her severe condition altered his consideration of the evidence that applies to the remaining evaluative steps. Thus, while the ALJ's step two discussion could certainly have been more carefully written, his failure to name the condition he found to be severe does not, in itself, warrant reversal. For these reasons, Plaintiff's motion is denied, and the Commissioner's motion is granted, on the step two issue.

### B.     The Step Three and Medical Source Issues

In its first remand order the Appeals Council noted that the ALJ had not properly evaluated the medical expert's testimony; the expert had stated at the hearing that Plaintiff met a listed impairment but did not specify which listing was at issue. (R. 236.) In his second decision, however, the ALJ did not evaluate the expert's testimony and overlooked that the new medical expert who testified at the second hearing contradicted the first expert by stating that Plaintiff did *not* meet a listing. The Council's second remand order noted these oversights and directed the ALJ in this case to resolve the inconsistency concerning the listing issue, an order that implicitly required the ALJ to determine what weight should be given to the various medical opinions in the record. Plaintiff claims that the ALJ in this case did not comply with either of these requirements, and the Court agrees.

Despite the Appeals Council's clear directive, the ALJ only remarked that "[e]ither implicitly or explicitly, all of the medical opinions of record on this issue are in accord." (R. 186.) Contrary to the Commissioner's claim, the ALJ's statement is conclusory in nature and fails to address the contradiction between Dr. Miller's and Dr. Leigh's testimony that formed the basis of the Appeals Council's second remand order. It is particularly striking in this regard that

the ALJ's decision does not mention the conflict identified by the Council or even acknowledge Dr. Miller's or Dr. Leigh's statements on the listing issue. Indeed, rather than addressing what the Appeals Council correctly viewed as a conflict, the ALJ essentially declared that no inconsistency ever really existed between the various medical opinions. This does not suffice to reconcile what are clearly opposing views on whether Plaintiff satisfies the step three requirements.

Moreover, by referring in general terms to "the medical opinions of record," the ALJ did not limit the scope of his less-than-clear finding to the first two testifying experts; he implicitly declared that those experts were also in accord with Plaintiff's treating physician, Dr. Farhi, who also submitted a medical opinion. The Listing 2.07 issue revolved around the question of whether or not Plaintiff had experienced any hearing loss confirmed by an audiology test, which is required to meet that listing requirement. Dr. Manfredi and Dr. McKenna testified that no confirming audiology tests were in the record. But the ALJ failed to note that Dr. Farhi's second Meniere's RFC assessment specifically stated that audiometry *had* shown that Plaintiff suffered from hearing loss. (R. 304.) Insofar as the ALJ was uncertain about Dr. Farhi's meaning on this critical issue, the regulations directed him to recontact the treating physician for additional evidence or for clarification of his statement. 20 C.F.R. § 404.1512(e). In the absence of any discussion of Dr. Farhi's statement, the ALJ did not provide an adequate explanation of his finding on the listing issue.

The ALJ's failure to address Dr. Farhi's opinion underscores the importance of the Appeals Council's directive in its first remand order that the ALJ was to evaluate the medical source opinions. Assigning weight to medical statements is a fundamental duty of an ALJ. *See*

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do."). As the regulations make clear, this encompasses *all* of the medical opinions in the record. 20 C.F.R. § 404.1527(d) ("[W]e will evaluate every medical opinion we receive."). Social Security Ruling 96-2p also directs an ALJ to weigh the opinion of a treating medical source like Dr. Farhi. *See* SSR 96-2p (stating that an ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). A treating source's opinion is ordinarily entitled to controlling weight when it is supported by the objective medical record and is not inconsistent with other substantial evidence. 20 C.F.R. § 414.1527(d)(2); *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005).

Like the ALJ who preceded him, the ALJ in this case once again failed to state what weight was given to any of the medical opinions.[2] The result is an uncertainty throughout the ALJ's decision as to how he reached his conclusions. Taking the example of Meniere's Disease, which was central to Plaintiff's case, conflicting medical opinions abound in the record. Based on the audiology issue, both Dr. McKenna and Dr. Manfredi were not convinced that she even suffered from this disorder at all, a conclusion that the ALJ appears to have adopted in his decision. Dr. Farhi, however, entered multiple diagnoses of the condition and provided two Meneiere's Disease RFCs to the ALJ. Dr. Syed agreed with this conclusion, and Dr. Miller testified at the first hearing that Plaintiff suffered from Meniere's. Despite these inconsistencies,

---

[2] The Commissioner has not responded to Plaintiff's argument on this issue, thereby waiving any objection to it. *See Laborers' Int'l Union of North Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments that are not presented in response to a motion for summary judgment are waived).

the ALJ provided no explanation of how he reached his conclusions on this important topic or how he resolved the contrasting diagnoses.[3] Without weighing *any* of the medical opinions, and by failing to explain why Dr. Farhi's opinion was not entitled to controlling weight as the treating physician, the ALJ did not adequately explain the basis for his decision or why he rejected or adopted any of the varied medical conclusions in this case.[4]

It is an ALJ's right and obligation to decide which medical source to believe, *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996), and the regulations provide a framework within which the ALJ can undertake this task. Here, the ALJ's failure to do so makes it impossible to follow the reasoning that supports his discussion and, in many respects, it leaves significant medical issues in the same state of conflict they were when this case was remanded to the ALJ before. The ALJ's failure to weigh any of the medical source opinions in this case means that substantial evidence does not support his finding at step three that Plaintiff did not meet or medically equal

---

[3] Similar inconsistencies on other issues could be cited. For instance, the ALJ discounted Plaintiff's complaint of vertigo by stating that such a condition is usually accompanied by nystagmus and nausea. In support, the ALJ relied on Dr. Manfredi's testimony to conclude that the various medical experts in this case had only noted nystagmus. (R. 184-85.) Dr. Farhi, however, stated three times that Plaintiff suffered both from vertigo and nausea. (R. 283, 297, 304.)

[4] As part of what appears to be a negative evaluation of Dr. Farhi's opinion, the ALJ noted that Plaintiff's ability to walk at the December, 2007 hearing was a "far cry" from Dr. Farhi's assessment that she needed assistance in ambulating. (R. 189.) The ALJ's finding overlooks that Dr. Farhi was only describing Plaintiff's ability to walk while she was having an episode of Meniere's Disease, not her general ability to ambulate. No evidence suggests that she was having such an attack at the 2007 hearing. The ALJ also found that Dr. Farhi's treatment notes were internally inconsistent because they describe a long-standing level of dysfunction yet state that she was doing "good." This fails to account for Dr. Farhi's response to an interrogatory explaining that what he meant was that Plaintiff had few exacerbations, not that her condition itself was acceptable. (R. 282-83.)

a listed impairment.  Thus, Plaintiff's motion is granted, and the Commissioner's motion is denied, on this issue.

### C.    The Credibility Issue

Plaintiff next argues that the ALJ erred in failing to credit her testimony concerning the duration and intensity of her symptoms.  The Court reviews an ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses." *Craft*, 539 F.3d at 678.  An ALJ's credibility determination warrants reversal only if it is so lacking in explanation or support that it is "patently wrong."  *Elder*, 529 F.3d at 413-14.  An ALJ should consider the entire case record and give specific reasons for the weight given to an individual's statements.  SSR 96-7p.  Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received, medication taken, and functional limitations.  *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).  Common sense, rather than technical errors, should guide such an analysis.  *See Alesia v. Astrue*, — F. Supp.2d —, 2011 WL 2038765, at *11 (N.D. Ill. May 24, 2011) ("Rather than nitpicking for inconsistencies or contradictions, courts are to give a common sense reading to an ALJ's opinion and reverse credibility determinations only if they are patently wrong.") (internal quotes and citation omitted).

Plaintiff argues that the ALJ erred because he backed up his credibility finding by concluding that, if Plaintiff's symptoms were as unpredictable as she stated, "her driving an automobile at any time during the period at issue would be beyond reckless conduct."  (R. 187.) The Court agrees that this was an unpromising start to the credibility analysis, although

Plaintiff's testimony that she could drive on some occasions was not irrelevant to her statements concerning the severity of her symptoms. However, Plaintiff overlooks that the ALJ went on to address a number of other factors in making his finding. The discussion is fragmented, but the ALJ considered the effects of Plaintiff's medication, inconsistencies between her testimony on her activities of daily living and other evidence in the record, and the degree to which her statements were supported by the medical record. *See* SSR 96-7p (stating the factors an ALJ should consider in assessing a claimant's credibility).

The last factor is required under SSR 96-7p, and the ALJ's discussion of it reveals another result of his failure to weigh the opinions of the various medical experts. The ALJ negatively evaluated Plaintiff's credibility, in part, based on the medical record but without discussing or resolving inconsistencies in that body of evidence. As noted above, the ALJ found that Plaintiff's complaints of vertigo were not corroborated by separate findings of nausea, even though Dr. Farhi confirmed that she experienced nausea.[5] The ALJ was also notably skeptical about Plaintiff's claim that working with computer screens aggravated her dizziness, but he ignored Dr. Miller's testimony at the first hearing that doing so could increase her symptoms. (R. 42-43.) Moreover, the ALJ relied on Dr. Farhi's treatment notes that she was doing "good" to discount her testimony, but he failed to balance this against Dr. Farhi's two RFC assessments that provide significant support for Plaintiff's testimony. *See Herron v. Shalala*, 19 F.3d 329,

------

[5] The ALJ criticized Dr. Farhi's notes to some degree by stating that the medical experts "consistently have noted" that his treatment notes were not helpful. (R. 187.) In fact, only Dr. McKenna made such a remark. Although Dr. Manfedi suggested that the notes did not state the degree to which Plaintiff's condition had improved (R. 341), neither he nor the other testifying experts criticized Dr. Farhi's treatment notes as the ALJ stated.

333 (7th Cir. 1994) (stating that an ALJ cannot discuss only that evidence that supports his ultimate conclusion).

Plaintiff contends that the ALJ compounded these errors by going beyond a proper analysis of the evidence to make his own medical conclusions about her condition. Such determinations are prohibited because it is well established that ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (citing cases). While it is true that an ALJ has the ultimate responsibility for determining disability, this obligation does not entitle him to reach medical conclusions on his own. *See Williams v. Apfel*, 48 F. Supp.2d 819, 825-26 (N.D. Ill. 1999). "The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). An ALJ's substitution of his own medical judgment, together with a disregard of relevant medical evidence, warrants reversal. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (citing cases).

The Court agrees that the ALJ reached at least one such conclusion that was related to Plaintiff's credibility. Plaintiff initially stated that her dizziness could be relieved to some degree by sitting down. Dr. McKenna took strong exception to this testimony, testifying that sitting down does not relieve vestibular issues and that Plaintiff's claim to the contrary suggested that her symptoms were actually psychosomatic in nature – an issue that became a much-discussed factor at the third hearing.[6] (R. 382-84.) After Dr. McKenna testified, however, Plaintiff

---

[6] A subsequent psychological examination apparently showed no basis for this conclusion, although the report itself is not part of the record. (R. 189). Certainly, no objective

(continued...)

clarified that what she meant by her comment was that tilting her head back while in a seated position, not the act of sitting itself, could relieve her symptoms. (R. 186, 385.) No medical expert evaluated her follow-up explanation.

Notwithstanding the absence of further medical commentary on this issue, the ALJ rejected Plaintiff's statement on the ground that "there is no medical basis for this behavior alleviating this complaint." (R. 186.) The ALJ had no expertise to conclude on his own that an inner ear problem cannot be alleviated by tilting the head backwards while a person is sitting down. By rejecting Plaintiff's statements concerning her symptoms based on own his own judgment, therefore, the ALJ substituted his medical conclusion for that of a medical expert.[7]

---

[6](...continued)
medical evidence other than Dr. McKenna's testimony supports such a hypothesis. The ALJ's reliance on Dr. McKenna's (unweighed) testimony is especially striking in light of the subsequent report, which the ALJ incorrectly anticipated would be "critical." (R. 407.) Dr. McKenna speculated at considerable length on Plaintiff's psychological condition, and even the ALJ took it upon himself to advise Plaintiff that it was possible that her problems "can be all in your head." (R. 382-84, 387.) The fact that the psychological report apparently failed to substantiate Dr. McKenna's conjectures suggests that at least some parts of his testimony were not entitled to great weight. *See McMurtry v. Astrue*, 749 F. Supp.2d 875, 888 (E.D. Wis. 2010) (stating that medical opinions can be given controlling weight on some points but not on others). Such a conclusion, of course, is for the ALJ to make.

[7] Although not a medical conclusion itself, the ALJ also mischaracterized Dr. McKenna's testimony concerning the use of a "table tilt" test. The ALJ was skeptical of Plaintiff's claim of vertigo and found that no clinician had noted the nausea that often accompanies it, even though Dr. Farhi did so on three occasions. (R. 283, 297, 304.) In his discussion of the issue, the ALJ claimed that Dr. McKenna had testified that a table tilt test is used to distinguish dizziness from true vertigo and noted that Plaintiff had never had such a test. (R. 186.) In fact, Dr. McKenna stated only that a table tilt test was used on persons with low blood pressure "to see if they have got this reflex hypotension, which does come out and occur at times and cause weakness or dizziness." (R. 381.) Dr. McKenna made clear, however, that little or no evidence in the record pertained to whether Plaintiff "actually has a component of orthostatic hypotension or not." (R. 382.) The ALJ himself pointed to no record evidence suggesting that Plaintiff was hypotensive.

*See* SSR 86-8 (stating that "presumptions, speculations, and suppositions should not be substituted for evidence").

Beyond these issues, a more fundamental problem in the ALJ's credibility determination exists here. As noted earlier, the Appeals Council remanded this case on two grounds. In addition to resolving inconsistent medical conclusions, the Appeals Council instructed the ALJ to remedy the prior ALJ's failure to provide a proper assessment of Plaintiff's credibility. The second ALJ had found that the record did not fully substantiate Plaintiff's subjective complaints, but he failed to determine if an underlying medically determinable physical or mental impairment existed that could be expected to produce such symptoms. (R. 229.) Social Security Ruling 96-7p states that this is the first finding an ALJ must make as part of the two-step test that applies to the evaluation of a claimant's symptoms. It is only after an ALJ has made such a finding that he moves to the second step of evaluating statements concerning the persistence and intensity of symptoms and, if needed, then assesses a claimant's credibility in light of the factors outlined in SSR 96-7p, such as activities of daily living, treatment procedures, and medication history. Accordingly, the Appeals Council ordered the ALJ on remand to address this issue.

The ALJ's decision presents a less-than-clear response to the Appeals Council's mandate. Unlike most cases of this type, the ALJ addressed the Plaintiff's credibility without first stating that the kind of medically determinable impairment the Council described existed here. Such a finding could be implied by the fact that he undertook a credibility analysis at all. *See Parker v. Astrue*, 664 F. Supp.2d 544, 553 (D.S.C. 2009) (stating that the ALJ proceeds to the second step "only after the threshold obligation has been met"). But the ALJ stated at the end of his decision – and entirely separate from his credibility decision – that "I am not convinced that any

medically determinable impairment has been established that would result in the profound symptom complex identified by the claimant."  (R. 191.)

Assuming for the sake of argument that this was the ALJ's response to the Appeals Council's order, the ALJ's conclusion runs afoul of significant medical evidence that Plaintiff had impairments that created her symptoms.  Dr. Syed determined that Plaintiff's Meniere's Disease had been accompanied by "intractable symptoms" since 1999  (R. 311), and Dr. Miller and Dr. Farhi also agreed that she had Meniere's.  The ALJ's statement also directly contradicts Dr. Leigh's testimony at the second hearing that chronic labyrinthitis was a "major impairment" for Plaintiff that "led to all of the symptoms which the claimant alleges today of the dizziness and problems with balance."  (R. 340.)  Dr. Leigh also concluded that Plaintiff's "other impairments" included allergic rhinitis, irritable bowel syndrome, and benign essential tumor.  (R. 340.)  It is undisputed that Plaintiff suffered from the last of these conditions and that she had been treated for the tremors that resulted from it since 1995.  (R. 154.)  Without weighing the various medical sources or providing an adequate discussion of the clear conflict between his conclusion and the record, the ALJ had no reasoned basis for finding that no medically determinable impairment existed that could have given rise to Plaintiff's various symptoms.[8]

_____

[8]  Along these lines, the ALJ construed Dr. Manfredi's testimony to mean that "other impairments (e.g., low blood pressure) might explain the claimant's symptoms that have been associated with Meniere's Disease by her treating doctor."  (R. 185.)  The ALJ's precise meaning in this language is not clear.  Dr. Manfredi actually spoke only in the hypothetical, stating that "*if* she suffered from low blood pressure there might be times when her blood pressure would drop to where she would lose her ability to coordinate and to maintain a good balance."  (R. 362) (emphasis added).  Insofar as the ALJ meant that Dr. Manfredi's statement, in fact, supported an alternative explanation for Plaintiff's symptoms, his conclusion is unwarranted.  Neither Dr. Manfredi nor the ALJ pointed to any evidence showing that Plaintiff suffered from low blood pressure.

It is well established that an ALJ "must articulate at some minimal level his analysis of the evidence," *Herron*, 19 F.3d at 333, and he must "build a logical bridge between the evidence and his conclusion." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). The ALJ here did not do so because he failed to resolve inconsistencies in the medical record before using certain parts of that record to discount Plaintiff's statements. *See Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995); *Harris v. Astrue*, 646 F. Supp.2d 979, 999 (N.D. Ill. 2009). It is the ALJ's duty to state the basis of his findings and to build logical transitions between them, and the Court cannot substitute its own inferences and speculations for the ALJ's reasoning. Accordingly, the Court finds that Plaintiff's motion is granted on the credibility issue, as well as on her claim that the ALJ improperly made independent medical findings.

### D.    The RFC Issue

Before an ALJ can proceed to step four, he must first determine a claimant's RFC. *Young*, 362 F.3d at 1000; 20 C.F.R. §§ 404.1529, 404.1545. RFC is an assessment of a claimant's ability to perform work-related duties on a continuing basis in spite of the limitations posed by her impairments or combination of impairments. 20 C.F.R. § 404.1545(a)(1). In making an RFC assessment, an ALJ must consider all of a claimant's medically determined impairments, including those that were not found to be severe at step two. 20 C.F.R. § 404.1545(a)(2). Here, the ALJ determined that Plaintiff could perform sedentary work, which involves lifting no more than ten pounds occasionally and carrying small objects. Some standing and walking may also be required under this standard. 20 C.F.R. § 404.1567(a). In addition, the ALJ placed a number of restrictions on Plaintiff's work abilities, including prohibitions on

climbing, more than occasional stooping, working at unprotected heights or around hazards, operating vehicles, or understanding, remembering, or carrying out complex tasks on a sustained basis.[9]  (R. 187.)  Accordingly, his RFC analysis includes both exertional limitations concerning Plaintiff's ability to sit, as well as non-exertional limitations.  Social Security Ruling 83-10 defines the latter as limitations that affect the mind, such as restrictions on the ability to climb, stoop, and concentrate, as well as environmental restrictions.  SSR 83-10.

This case presents a puzzling situation.  An RFC assessment measures "the extent to which an individual's medically determinable impairment(s) . . . may cause physical or mental limitations or restrictions" that affect the ability to work.  SSR 96-8p.  *See also Craft*, 539 F.3d at 676 ("When determining the RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered 'severe.'").  By reaching an RFC finding, the ALJ necessarily determined that Plaintiff had limitations that resulted from her "impairment(s), and any related symptoms" that stemmed from those impairments, as such a finding must always be reached before an RFC can be established.  20 C.F.R. § 404.1545(a)(1).  As discussed above, however, the ALJ found that Plaintiff did *not* have a medically determinable impairment that could be expected to give rise to her symptoms.

Notwithstanding, Plaintiff argues that the ALJ's RFC assessment failed to undertake a function-by-function discussion of her abilities to perform the tasks required by sedentary work.

---

[9]  Plaintiff contends that the ALJ's restrictions imply a finding of a mental impairment that should have been addressed at step two.  Pursuant to 20 C.F.R. § 404.1520a, a "special technique" is required at step two to determine the severity of such an impairment.  *See Richards v. Astrue*, 370 Fed.Appx. 727, 730 (7th Cir. 2010) (unpublished opinion).  As discussed above, however, it is not clear what impairments, physical or mental, the ALJ actually found in this case.  As Plaintiff does not discuss how the non-exertional restrictions here relate to a mental impairment, the Court does not address this issue.

Contrary to this claim, however, an ALJ is not required to perform such an analysis. *Knox v. Astrue*, 327 Fed.Appx. 652, 657 (7th Cir. 2009) (unpublished opinion) ("[T]he expression of a claimant's RFC need not be articulated function-by-function[;] a narrative discussion of a claimant's symptoms and medical source opinions is sufficient"); *Strocchia v. Astrue*, No. 08 C 2017, 2009 WL 2992549, at *20 (N.D. Ill. Sept. 16, 2009).

Nevertheless, the requirement that an ALJ adequately discuss the medical opinions in support of his RFC finding is not met in this case. Plaintiff correctly notes that the ALJ stated that he found the testimony of the experts at all three hearings to be helpful in understanding Plaintiff's complaints. His failure to weigh them, however, makes it impossible to follow the logic of his reasoning or to determine what evidence he relied on to support the RFC determination itself. Neither Dr. McKenna nor Dr. Manfredi gave any opinion at the third hearing as to Plaintiff's exertional or non-exertional limitations, and no expert at any of the three hearings testified on Plaintiff's cognitive restrictions. Dr. Leigh stated at the second hearing that she had no exertional limitations but did impose some non-exertional restrictions. (R. 341.) Dr. Miller testified at the first hearing that she could perform light, sedentary work. (R. 42-43.) The ALJ discussed none of these RFC findings at all, and "[n]either the Commissioner nor the court may supply reasons for the ALJ." *Baker ex rel. Baker v. Barnhart*, 410 F. Supp.2d 757, 766 (E.D.Wis. 2005). The result is especially troubling in that the ALJ did not place any restrictions on Plaintiff's need to read or to use computers as part of her work, even though Dr. Miller specifically testified that both activities would aggravate her symptoms and restricted her from doing so. (R. 43.)

Plaintiff further argues that the ALJ improperly failed to discuss how she would be able to carry out the work duties implied by the ALJ's RFC determination on a sustained basis. Such findings are required as part of a RFC assessment. Social Security Ruling 96-8p's "Narrative Discussion Requirement" lays out topics on which an ALJ must provide some discussion and "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p. These include "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)" as well as a description of how the evidence supports each of an ALJ's RFC conclusions. SSR 96-8p. An ALJ's failure to explain how he arrived at his exertional conclusions under SSR 96-8p is "in itself sufficient to warrant reversal of the ALJ's decision" when it omits crucial medical facts. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

Here, the ALJ elicited testimony on this topic from Dr. McKenna by citing Dr. Farhi's opinion concerning the frequency and extent of Plaintiff's vestibular attacks. In his two Meneiere's Disease RFC assessments, Dr. Farhi stated that Plaintiff had two to three vestibular problems each month and that each episode could last up to five days. (R. 298, 305.) The ALJ asked Dr. McKenna if Plaintiff could maintain an eight-hour work day while experiencing symptoms, to which Dr. McKenna responded, "absolutely not." (R. 394.) Despite this testimony, the ALJ did not discuss why Plaintiff would be able to work a normal work schedule five days a week, as required by SSR 96-8p. By failing to provide any discussion as to why Dr. Farhi's opinion was not entitled to controlling weight, he also failed to build a logical bridge between

the evidence he relied on to question Dr. McKenna and his implicit conclusions on Plaintiff's ability to work on a sustained basis.

For these reasons, the Plaintiff's motion is granted, and the Commissioner's motion is denied, on this issue.

### E. The Step Five Issue

Finally, Plaintiff argues that the ALJ erred at step five by failing to resolve an inconsistency between the testimony of the various vocational experts who appeared at the three hearings. The VE who appeared at the first hearing stated that jobs existed in the national economy that Plaintiff could perform. Based on Dr. McKenna's testimony that Plaintiff would not be able to work while experiencing vestibular symptoms, the VE at the third hearing came to the opposite conclusion and stated that Plaintiff could not sustain any employment. (R. 406.) The ALJ dismissed the last VE's statement in summary form by concluding, as discussed earlier, that no medically determinable impairment existed that could reasonably be expected to create Plaintiff's symptoms. (R. 191.) As this conclusion is not supported by substantial evidence, however, the ALJ was not entitled to rely on it to disregard the third VE's statements.

Nevertheless, the Commissioner argues that the ALJ's finding at step five was still proper on another ground – Plaintiff's testimony concerning the number of days she would need to be absent from work. According to the Commissioner, the ALJ properly evaluated Plaintiff's statements on this issue. This argument overlooks that Plaintiff did not testify on this issue. Instead, the ALJ's question to the VE was based on Dr. McKenna's testimony, which in turn responded to statements made in Dr. Farhi's RFC assessment on the frequency and duration of

Plaintiff's vestibular attacks. Without any assessment of Dr. Farhi's or Dr. McKenna's statements, however, the ALJ had no reasoned ground for disregarding Dr. Farhi's opinion on this critical issue or for setting aside Dr. McKenna's testimony based on it. As a result, the ALJ had no basis for adopting the opinion of the first VE or for rejecting the third VE's testimony that Plaintiff could not perform any work in the national economy.[10] Thus, Plaintiff's motion is granted, and the Commissioner's motion is denied, on this point.

### V.   Conclusion

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Dckt. 29] and the Commissioner's motion for summary judgment [Dckt. 39] are both granted in part and denied in part. Accordingly, the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
**Dated:**  August 8, 2011.                                        United States Magistrate Judge

---

[10]  Plaintiff also claims the ALJ should not have accepted the job numbers provided by the VE at the first hearing because she was unrepresented at that point and that the ALJ prevented her counsel at the third hearing from inquiring into this matter. In light of the Court's ruling on the step five issue, it does not address this issue. The Court notes, however, that "the data and reasoning underlying [a VE's] bottom line must be 'available on demand' if the claimant challenges the foundation of the vocational expert's opinions." *McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2004) (quoting *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)). In light of the Commissioner's continued errors in this case, the Court assumes that Plaintiff's counsel will have a full opportunity on remand to explore these issues in compliance with *McKinnie* if the ALJ determines that VE testimony is required.